James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Matt Keil
John C. Goodson
KEIL & GOODSON P.A.
406 Walnut Street
Texarkana, Arkansas 71854
(870) 772-4113

Joseph H. Meltzer
Kimberly A. Justice
Naumon A. Amjed
Melissa L. Troutner
KESSLER TOPAZ
  MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

 *Attorneys for Plaintiffs City of
Texarkana, Arkansas and City of Texarkana,
Texas d/b/a Texarkana Water Utilities*

*Additional counsel for Plaintiffs City of
Texarkana, Arkansas and City of Texarkana,
Texas d/b/a Texarkana Water Utilities*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE CITY OF TEXARKANA, ARKANSAS and THE CITY OF TEXARKANA, TEXAS d/b/a TEXARKANA WATER UTILITIES, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FRANK A. REICHL, GENERAL CHEMICAL PERFORMANCE PRODUCTS LLC, GENERAL CHEMICAL CORPORATION, GENTEK, INC., CHEMTRADE LOGISTICS INCOME FUND, CHEMTRADE LOGISTICS, INC., CHEMTRADE CHEMICALS CORPORATION, CHEMTRADE CHEMICALS US, LLC, AND JOHN DOES 1-10,<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs The City of Texarkana, Arkansas and The City of Texarkana, Texas jointly d/b/a Texarkana Water Utilities, individually and on behalf of all others similarly situated, allege the following against Defendants Frank A. Reichl, General Chemical Performance Products LLC and General Chemical Corporation (collectively, "General Chemical"), Gentek, Inc., Chemtrade Logistics Income Fund, Chemtrade Logistics, Inc., Chemtrade Chemicals  Corporation, Chemtrade Chemicals US, LLC, and John Does 1-10 (collectively, "Defendants"), based upon information and belief[1] except as to the allegations pertaining specifically as to Plaintiffs that are based on personal knowledge:

## NATURE OF THE ACTION

1.      This antitrust class action arises from a scheme by Defendants and their employees to conspire—in violation of federal law—to eliminate competition in the liquid aluminum sulfate ("Liquid Alum") market by engaging in price-fixing, bid-rigging and allocating customers among co-conspirators between January 1, 1997 and July 31, 2010 (the "Class Period").

2.      Plaintiffs and the Class allege that Defendants and their co-conspirators conspired to artificially fix, maintain, stabilize and/or inflate prices for Liquid Alum that they sold to purchasers, including Plaintiffs and Class members, in the United States during the Class Period. As detailed below, Plaintiffs directly purchased Liquid Alum from at least one Defendant during the Class Period for use in connection with Texarkana Water Utilities' operations.

---

[1] Plaintiffs' information and belief are based on an investigation (by and through counsel) which included, among other things, a review and analysis of publicly available information including pleadings in *United States of America v. Frank A. Reichl*, No. 2:15-cr-00554-JLL (D.N.J.), press releases, news articles, publically-submitted bids and additional analysis.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

3.      Plaintiffs seek recovery on behalf of themselves and the proposed Class of direct purchasers, as defined herein, under Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3 and Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

4.      Liquid Alum is a versatile chemical utilized by municipalities and industries for a variety of uses including, *inter alia*, treating drinking water, controlling algae in lakes and ponds, treating wastewater, manufacturing paper and pulp and fixing dyes to textiles.  Defendants are major manufacturers and/or distributers of Liquid Alum in the United States market (and their employees) and are direct competitors in the Liquid Alum industry.

5.      On October 27, 2015, the United States Department of Justice ("DOJ") announced that Defendant Frank A. Reichl pled guilty to engaging in a conspiracy to fix prices, rig bids and allocate customers in the Liquid Alum market during the Class Period.  *See United States of America v. Frank A. Reichl*, No. 2:15-cr-00554-JLL, ECF No. 5 (D.N.J. Oct. 27, 2015) (the "Plea Agreement").[2]  Reichl is the former Vice President of Sales of Defendant General Chemical.[3]  According to the DOJ, from 2006 through 2010, Reichl worked for an unidentified company involved in the conspiracy and which maintains its principal place of business in Parsippany, New Jersey.[4]  According to the Plea Agreement, the volume of commerce in the Liquid Alum market attributable to Defendant Reichl was more than $100 million.  *See* Exhibit A at 10, ¶ 5.

---

[2] The Plea Agreement is attached as Exhibit A.

[3] *See* Leah Nylen & Joshua Sisco, *Former Chemical Executive Pleads Guilty to Fixing Prices of Liquid Aluminum Sulfate*,  Mlex (Oct. 27, 2015), http://www.mlex.com/PlaintiffLitigation/DetailView.aspx?cid=731089&siteid=188&rdir=1.

[4] *See United States of America v. Frank A. Reichl*, No. 2:15-cf-00554-JLL, ECF No. 1 (D.N.J. Oct. 27, 2015) (the "Information") at ¶¶ 2-4.  The Information is attached as Exhibit B.

6.      In addition to Reichl's admissions, Defendant Chemtrade Logistics Income Fund has also admitted that it is the subject of "an ongoing investigation by the U.S. Department of Justice concerning alleged anticompetitive conduct in the water treatment chemicals industry."[5] According to the company's 2014 Annual Information Form, "Chemtrade is cooperating with the investigation and has the benefit of the conditional amnesty from the U.S. Department of Justice for its conduct regarding sales of the water treatment chemicals under investigation which General Chemical had obtained prior to the General Chemical Acquisition."[6]

7.      The DOJ issued a press release regarding the conspiracy alleged herein on October 27, 2015, stating "[t]he charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among [Reichl] and his co-conspirators, the substantial terms of which were to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of liquid aluminum sulfate sold to municipalities and pulp and paper companies in the United States."[7]

8.      According to the DOJ, Reichl and his co-conspirators "met to discuss each other's liquid aluminum sulfate business, submitted intentionally losing bids to favor the intended winner of the business, withdrew inadvertently winning bids and discussed prices to be quoted or bid to customers."[8]

---

[5] *See Chemtrade Logistics Income Fund Annual Information Form for the year ended December 31, 2014* (Mar. 5, 2015) at 40-41, http://www.chemtradelogistics.com/main/wp-content/uploads/CHEUN_Annual_Information_ Form2014.pdf.

[6] *See id.*

[7] *See Former Executive Admits Guilt in Conspiracy Affecting Water Treatment Chemicals*, Department of Justice, Office of Public Affairs (Oct. 27, 2015) (the "DOJ Press Release"), http://www.justice.gov/opa/pr/former-executive-admits-guilt-conspiracy-affecting-water-treatment-chemicals.  The DOJ Press Release is attached as Exhibit C.

[8] *See id.*

9.     As detailed in the Plea Agreement, from at least 1997 through July 2010, Defendant Reichl and his co-conspirators, including Defendants, violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in a combination and conspiracy to suppress and eliminate competition in the Liquid Alum market "by agreeing to rig bids and allocate customers for, and to fix, stabilize and maintain the price of liquid aluminum sulfate" sold to Plaintiffs and Class members.  *See* Plea Agreement at ¶ 1.  Defendants and their co-conspirators also agreed to combine and perform the acts necessary to achieve their anticompetitive conspiracy and to conceal their unlawful conduct from antitrust regulators and the public.  *See, e.g.,* Information at ¶¶ 12-13.  Additional details about the Defendants' conspiracy are set forth in the Information which pleads that "[Reichl] and his co-conspirators . . . combined and conspired to . . . among other things":

- "agreeing to 'stay away' from each other's 'historical' customers by not pursuing the business of those customers";

- "tracking bid and pricing histories to determine which accounts were the 'historical' customers of each co-conspirator or other supplier of liquid aluminum sulfate, so as to determine whether to pursue a particular contract or to submit an intentionally losing or 'throw away' bid or price quotation";

- "submitting intentionally losing or 'throw away' bids or price quotations to each other's 'historic' liquid aluminum sulfate customers";

- "from time to time, in the District of New Jersey and elsewhere, discussing the price to be quoted to a customer by the intended winner to determine the amount of the intended loser's intentionally losing or 'throw away' bid or price quotation";

- "from time to time, upon request of a co-conspirator, withdrawing inadvertently winning bids submitted to co-conspirators' 'historical' customers";

5

- "where a co-conspirator could not withdraw its inadvertently winning bid, bidding to lose on one of its own customers to compensate for the loss of that 'historical' customer"; and

- "instructing new employees as to how to determine whether and how to bid on or quote a price for the business of liquid aluminum sulfate customers so as to comport with the agreement not to compete between the defendant and co-conspirators."

*Id.* at ¶ 13.

10.     Defendants effectively concealed their unlawful conduct from Plaintiffs and Class members until October 27, 2015—when it first was reported that Defendant Reichl pled guilty to antitrust violations related to price-fixing in the Liquid Alum market.  *See generally,* Information.

11.     Defendants' conduct violated Sections 1 and 3 of the Sherman Antitrust Act.  *See, e.g.*, *id.* at ¶ 11 ("The combination and conspiracy engaged in by [Reichl] and his co-conspirators was in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.").

12.     Defendants' conduct proximately and foreseeably caused Plaintiffs and Class members to suffer injuries by forcing them to pay artificially fixed, maintained, stabilized and/or inflated prices for Liquid Alum throughout the Class Period, which were higher than prices for Liquid Alum that would have been established in a competitive market.  Defendants have earned substantial profits from their anticompetitive conduct as a result of charging supra-competitive prices, and Plaintiffs and Class members have been injured as a direct and proximate result of Defendants' actions.

13.     Plaintiffs and Class members seek damages for their injury caused by Defendants' collusive, manipulative and anticompetitive restraint of trade in the market for Liquid Alum.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a), and pursuant to Section 4 of the Clayton Act, 15 U.S.C. §§ 15(a) as the action arises under Sections 1 and 3 of the Sherman Act, 15 U.S.C. § 1.

15.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§15(a), 22 and 28 U.S.C. §1391(b), (c), and (d) because (1) one or more of the Defendants resided, transacted business, were found, and/or had agents in this District; (2) a substantial part of the events giving rise to Plaintiffs' claims arose in the District; and/or (3) a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.  As set forth in the Information, "[Reichl and his co-conspirators] participat[ed] in meetings and conversations in the District of New Jersey and elsewhere to discuss each other's liquid aluminum sulfate business."  Information at ¶ 13.

16.     Each Defendant is subject to personal jurisdiction in this District because each, directly and/or through its subsidiaries and affiliates: (1) transacted business throughout the United States, including in this District; (2) manufactured, distributed and/or sold Liquid Alum throughout the United States, including in this District; (3) had substantial contacts with this District; and/or (4) engaged in an illegal scheme to conspire to artificially fix, maintain, stabilize and/or inflate prices for Liquid Alum that was directed to and had the intended effect of injuring Plaintiffs and Class members, including Class members residing in, located in, or doing business in this District.

## PARTIES AND RELEVANT ENTITIES

17.     Plaintiff The City of Texarkana, Arkansas is a municipality.

18.     Plaintiff The City of Texarkana, Texas is a municipality.

19.     Texarkana Water Utilities ("TWU"), an unincorporated entity subject to the control of both the Cities of Texarkana, Arkansas and Texarkana, Texas (collectively, the "Cities"), manages and operates the two Cities' separate but integrated water and sewer systems. The Cities, acting jointly through TWU, directly purchased Liquid Alum from one or more of the Defendants during the Class Period at supra-competitive prices due to the conspiracy alleged herein and suffered antitrust injury and damages.

20.     Defendant Frank A. Reichl resides in Flanders, New Jersey.  Defendant Reichl was the former Vice President of Sales of General Chemical.  Throughout the Class Period, Defendant Reichl and his co-conspirators conspired to eliminate competition in the liquid aluminum sulfate market by engaging in price-fixing, bid-rigging and allocating customers.  In October 2015, Defendant Reichl pled guilty to engaging in the conspiracy alleged herein.  *See* Plea Agreement at ¶1.

21.     Defendant General Chemical Performance Products LLC was a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

22.     Defendant General Chemical Corporation was a Delaware corporation with its principal place of business in Parsippany, New Jersey.

23.     Defendant GenTek Inc. ("GenTek") was a Delaware corporation with its principal place of business in Parsippany, New Jersey.  GenTek manufactured and supplied water treatment chemicals, including Liquid Alum, throughout the United States, including in this District.  Defendant GenTek owned and controlled Defendants General Chemical Performance Products LLC and General Chemical Corporation.

24.     Defendant Chemtrade Logistics Income Fund is a limited purpose trust under the laws of the Province of Ontario and is headquartered in Toronto, Canada.  It was established in 2001 and manufactures and markets industrial chemicals, including Liquid Alum, and other coagulants used in water treatment in Canada, the United States and Europe.

25.     Defendant Chemtrade Logistics Inc. is a subsidiary of Defendant Chemtrade Logistics Income Fund incorporated under the laws of the Province of Ontario.

26.     Defendant Chemtrade Chemicals Corporation is a Delaware corporation and is a subsidiary of Chemtrade Logistics Income Fund.

27.     Defendant Chemtrade Chemicals US, LLC is a Delaware limited liability company and is a subsidiary of Chemtrade Logistics Income Fund.

28.     In 2009, American Securities LLC acquired GenTek.   In January 2014, Chemtrade Logistics Income Fund acquired General Chemical from American Securities for $860 million.   Defendants Chemtrade Logistics Income Fund, Chemtrade Logistics Inc., Chemtrade Chemicals Corporation, and Chemtrade Chemicals US, LLC (collectively, "Chemtrade") absorbed General Chemical, assumed all rights and obligations of General Chemical in the acquisition, and became the legal successor in interest to General Chemical.  As such, Chemtrade assumed the liability of General Chemical's conspiracy to artificially fix, maintain, stabilize and/or inflate the prices of Liquid Alum to noncompetitive prices during the Class Period.

29.     Defendants John Does 1-10 are other persons or entities whose identities are currently unknown to Plaintiffs.  John Does 1-10 colluded and conspired to manipulate the market for Liquid Alum during the Class Period.

## <u>UNIDENTIFIED CO-CONSPIRATORS AND AGENTS</u>

30.     Persons, firms, corporations and entities not named as Defendants in this complaint, the identities of which are presently unknown, have participated as co-conspirators with the named Defendants in the acts or conduct alleged herein and/or acted in furtherance of the combination and/or conspiracy.

31.     The unidentified co-conspirators are referred to herein as "co-conspirators" and during the Class Period combined and/or conspired with each other and/or the named Defendants to artificially fix, raise, maintain, and/or stabilize the prices of Liquid Alum sold in the United States at noncompetitive prices.

32.     Plaintiff reserves the right to amend this Complaint to name as Defendants some or all of these persons, firms, corporations and entities that acted as co-conspirators at a later date and as their identities become known through discovery.

33.     Each Defendant and/or co-conspirator acted as the principal of, or agent for, the other Defendants and/or co-conspirators with respect to the unlawful acts and common course of conduct alleged herein.

34.     All references herein to any act or transaction of any corporation, limited liability entity or co-conspirator entity should be understood to mean that the corporation or limited liability entity or co-conspirator entity engaged in the alleged act or transaction by or through its officers, directors, agents, employees and/or representatives while they were actively engaged in the management, direction, control and/or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

**I.    BACKGROUND ALLEGATIONS**

**A.    Liquid Aluminum Sulfate**

35.    Liquid Alum is a widely-used chemical most typically utilized for water treatment, including the removal of impurities from drinking, industrial or wastewater, and for the manufacture of pulp and paper.

36.    Liquid Alum may be used in potable water applications as a primary coagulant or in raw water for charge neutralization and flocculation to remove turbidity, suspended solids, total organic carbon and biochemical oxygen demand.  The chemical hydrolyzes to form insoluble precipitates and allows for the removal of particles that are otherwise too small to be filtered.

37.    Two of the largest groups of customers for Liquid Alum are (1) municipalities and water utilities, which use Liquid Alum as a coagulant and flocculant to treat drinking and wastewater; and (2) pulp and paper manufacturers, which use Liquid Alum in the manufacturing process.

38.    Municipalities and water utilities typically purchase Liquid Alum through a publically-advertised competitive bidding process where manufacturers and/or suppliers submit bids and a low bidder is selected as the supplier.  The results of the bidding process are public and the contracts are typically one year in duration, with certain contracts providing for specified renewal periods.

39.    Pulp and paper manufacturers typically purchase Liquid Alum by submitting price requests to manufacturers.  The price requests result in private negotiations between the suppliers and their customers.

40.     Liquid Alum is typically sold ready to use and can easily be mixed with water.  It is most often sold in bulk by the ton and transported by rail or truck from the manufacturing plant of the supplier that is closest to the customer.  Freight is a significant price component for Liquid Alum.  According to the DOJ, "[o]ne factor suppliers of liquid aluminum sulfate consider in deciding whether to bid or quote on a contract is whether the business is 'freight logical,' that is, whether the liquid aluminum sulfate supplier can make a profit on the business taking into account the distance from the supplier's plant to the customer and the corresponding cost of freight."  Information ¶ 10.

41.     In addition to Defendants, other major manufacturers and/or distributers in the Liquid Alum market include, *inter alia*: Affinity Chemical LLC ("Affinity Chemical"), Kemira Water Solutions, Inc., GEO Specialty Chemicals, Southern Ionics Incorporated, C&S Chemicals, Inc., Border Chemicals Company Ltd., Chameleon Specialty Chemicals, GAC Chemical Corporation, USALCO, Eco Services Operations LLC, PVS Chemicals, Inc., Brenntag Southwest, Inc., Thatcher Company, Ashland Hercules Incorporated, Harcros Chemicals, Univar USA f/k/a/ Van Waters & Rogers and Mil-Spec Industries Corp.

**B.     The Liquid Aluminum Sulfate Market Was Susceptible to Collusion**

42.     The Liquid Alum market was susceptible to collusion because Liquid Alum is a commodity for which competition is primarily based on price and there is a lack of economic substitutes.  Further, the Liquid Alum market is a mature market with weak demand and high barriers to entry, thereby making collusion among major market participants desirable.

43.     Mature markets, such as the Liquid Alum market—where competition is based on price—are more susceptible to collusion because price is an objective factor, which is easily measured, as opposed to subjective factors such as service.

44.     Further, there is a lack of economic substitutes in the Liquid Alum market because there are no close substitutes for Liquid Alum that are a functional equivalent at a similarly inexpensive price.

45.     Weak demand is another factor which leads to collusion among market participants.  Demand for Liquid Alum is tied to the markets in which the chemical is used, including the paper and pulp markets.  As demand in the paper and pulp market slowed during the Class Period, demand for Liquid Alum also weakened.

46.     While the supra-competitive pricing that results from collusion in a market typically would attract competitors, high barriers to entry in the Liquid Alum market including high start-up costs for manufacturing facilities and distribution channels block new entrants from entering the market.  Thus, Defendants and their co-conspirators had motive to collude in the Liquid Alum market.

47.     Defendants also had the opportunity to conspire as Defendant Reichl and other Defendants attended local and national industry conferences where they were able to share customer and market information and participate in collusion and/or acts to further their conspiracy.

48.     For example, Christopher B. Lind of General Chemical presented at the American Water Works Association-Water Environment Federation Joint Residuals Management

Conference in Philadelphia, Pennsylvania on August 5, 1997.[9]  General Chemical also presented at the Kansas Rural Water Association Annual Conference in 1998.[10]

49.     In May 2001, General Chemical attended the Florida Lake Management Society Annual Conference in Tallahassee, Florida.[11]  As part of the exhibition, General Chemical described itself as a manufacturer of aluminum sulfate with 37 plants in North America.[12] General Chemical also attended the 2002 Florida Lake Management Society Conference in Naples, Florida and 2003 North American Lake Management Society Southeast Lakes Conference in Orlando, Florida, where it described itself as "one of the largest suppliers of alum (aluminum sulfate)."[13]  Theresa Bryan, the Director of Environmental Services & Products, was named as General Chemical's contact person for the 2002 and 2003 conferences.[14]

50.     General Chemical sponsored and attended the annual conference of the Florida Lake Management Society in 2004 which was held at the Saddlebrook Resort in Tampa,

---

[9] *See* Christopher B. Lind, *Water Treatment Residuals Used to Treat Eutrophic Soils* at n. 1, http://stormwater.ucf.edu/fileRepository/docs/chemicaltreatment/documents/WATER%20TREA TMENT%20RESIDUALS.pdf.

[10] *See 1998 Conference Attendance Shatters Records*, The Kansas Lifeline (July 1998), http://www.krwa.net/lifeline/archives/0798confmain.html.

[11] *See Twelfth Annual Conference*, Florida Lake Management Society (May 21-24, 2001), http://flms.net/uploads/proceedings/2001_proceedings.pdf.

[12] *See id.*

[13] *See 13th Annual Symposium*, Florida Lake Management Society (June 10-13, 2002) at 11, http://flms.net/uploads/proceedings/2002_proceedings.pdf; *12th Annual North American Lake Management Society Southeast Lakes Conference* (June 2-3, 2005) at 16, http://flms.net/uploads/proceedings/2003_proceedings.pdf.

[14] *See id.*

Florida.[15]   At the conference, General Chemical described itself as "a leader in supplying products for the purification of water and wastewater, lake and watershed restoration, storm water treatment, pulp and paper manufacturing, industrial manufacturing, and agricultural production and waste management" with a "network of 41 production locations and terminals serve the North American market for aluminum sulfate, ferric sulfate, polyaluminum coagulants, formulated coagulants, BaraclearTM buffered alum briquettes, sodium nitrite, and industrial chemicals."[16]   Christopher Lind and Vic Johnson were listed as contacts for General Chemical.[17]

51.     On December 3, 2004, Rich Fedison, Director of Sales and Marketing for General Chemical Performance Products LLC announced to the industry that "demand is stable and beginning to strengthen in most major end-use markets" and that "[a]ll announced price increases for aluminum based inorganic coagulants are continuing to hold in all end-use markets."[18]   This announcement signaled to the market, including Defendants and their co-conspirators, that artificially inflated prices in the Liquid Alum market could be maintained based on pretext.

52.     Around the same time, General Chemical made the following price increases: (1) $335 per ton for commercial-grade aluminum sulfate on the East and Gulf Coasts; (2) $370 per ton for commercial-grade aluminum sulfate on the West Coast; (3) $214 per ton for liquid

---

[15] *See 15th Annual Conference of the Florida Lake Management Society* (June 7-10, 2014) at 3, 12, http://flms.net/uploads/proceedings/2004_proceedings.pdf.

[16] *See id.*

[17] *See id.*

[18] *See Aluminum Sulfate Prices Rise with Demand and Costs*, ICIS Chemical Business (Dec. 3, 2004), http://www.icis.com/resources/news/2004/12/03/633745/aluminum-sulfate-prices-rise-with-demand-and-costs.

material in tanks; (4) $331 per ton for iron-free liquid material in tanks; and (5) $425 per ton for dry iron-free aluminum sulfate.[19]

53.     Contemporaneously, United States Aluminate Company Inc. raised its prices for aluminum sulfate by $10 per dry ton (or as contracts permitted) and Kemiron Companies raised its prices for all grades of polyaluminum chloride, aluminum chloride, aluminum chlorohydrate, sodium aluminate and polyaluminum sulfate by 2 cents per pound (or as contracts permitted).[20]

54.     As alleged herein, sales of Liquid Alum in the United States were dominated by a limited number of large manufacturers, including Defendants, and the market for Liquid Alum was susceptible to anticompetitive manipulation because of the high barriers to entry in the already mature and highly consolidated Liquid Alum industry.

55.     Publically available bids indicate that there were often large discrepancies between bids submitted by the winning bidder and the other bidders in the Liquid Alum market. On information and belief, these discrepancies in bid prices were a result of collusion in the Liquid Alum market.  For example, in October 2005, Plaintiff The City of Texarkana, Arkansas awarded General Chemical a contract for Liquid Alum based on General Chemical's bid of $174.86 per ton.[21]  The other bidders included GEO Specialty Chemicals, Inc. at $234.10 per ton and Altivia at $244.00 per ton.[22]  General Chemical also won The City of Texarkana, Arkansas

---

[19] *See id.*

[20] *See id.*

[21] *See* City of Texarkana, AR Request for Board Action (Oct. 3, 2005), http://arkagenda.txkusa.org/2005/10032005/10032005agenda_html/item_6c_10032005_twu_Ch emical_Bids.htm; *see also Resolution No. 5239* (Oct. 2, 2005) (awarding contract to General Chemical), http://arkansas.txkusa.org/departments/city-clerk/documents/indexes/resolution/5239.pdf.

[22] *See id.*

Liquid Alum contract in 2007 with a bid of $207.00 per ton.[23]  The second and only other bidder, GEO Specialty Chemicals, Inc., bid $300.60 per ton.[24]

56.     Other examples include, the City of Bellingham, Washington which in October 2003, awarded a contract for Liquid Alum to General Chemical with a bid of $183.50.[25]  The second bidder, Kemiron Companies, bid $242.00.[26]  There were no other bidders.

57.     In November 2007, General Chemical was awarded the Fayetteville, North Carolina Liquid Alum contract with a bid of $447,938.40 for 4200 tons.  The losing bids were as follows: GEO Special Chemicals ($556,298.40); Kemira Water Solutions ($569,520.00); and C & S Chemicals ($677,040.00).[27]  Again, there were large discrepancies between the winning and losing bids.  In comparison, the bids on caustic soda, another chemical bid for the same project, had minor differences: Bid 1 ($214,500.00); Bid 2 ($223,500.00); Bid 3 ($224,200.00); Bid 4 ($224,800.00); and Bid 5 ($281,460.00).[28]

---

[23] *See* City of Texarkana, AR Request for Board Action (Nov. 5, 2007), http://arkagenda.txkusa.org/2007/11052007/11052007agenda_html/item_4g_11052007_twu_che mical_bids.htm.; *see also Resolution No. 5471* (Nov. 5, 2007) (awarding contract to General Chemical), http://arkansas.txkusa.org/departments/city-clerk/documents/indexes/resolution/5471.pdf .

[24] *See id.*

[25] *See* City Council Agenda Bill (Oct. 27, 2003), ftp://ftp.cob.org/council/packets/2003/10_oct/27/packets/27oct2003_AB15843.pdf.

[26] *See id.*

[27] *See* Fayetteville City Council Minutes (Nov. 13, 2007), http://fayettevillenc.gov/Home/ShowDocument?id=2215.

[28] *See id.*

58.     On July 15, 2008, the City of Sacramento awarded General Chemical a three-year Liquid Alum contract in a total amount not to exceed $6,875,550.[29]  General Chemical's bid was $1,980,000 for year one of the contract.[30]  No other manufacturer bid against General Chemical for the contract.  Specifically, Graymont Western US, Inc. and Univar US, Inc. submitted "NO BID."[31]  Moreover, General Chemical had previously been awarded a three-year contract from the City of Sacramento in 2005, in an annual amount not to exceed $950,000.00.[32]  Although the city had sent requests for bids to nine vendors, General Chemical was the only vendor to submit a bid.[33]

59.     In November 2008, General Chemical was awarded a Liquid Alum contract by the Lake County Water Authority in Tavares, Florida after submitting a bid of $268.50 per dry ton.[34]  The bid included a price increase of 6.5% to $286.00 per dry ton effective January 31,

---

[29] *See Report to Council*, City of Sacramento (July 15, 2008), http://sacramento.granicus.com/MetaViewer.php?view_id=22&clip_id=1573&meta_id=152936.

[30] *See id.*

[31] *See id.*

[32] *See Adoption of Specifications and Award of Bid No. B051181028 for the Purchase of Liquid Aluminum Sulfate (Alum) in an Annual Amount Not to Exceed $950,000*, City of Sacramento (June 10, 2005), http://www.google.com/url?sa=t&rct=j&q=&esrc=s&frm=1&source=web&cd=1&sqi=2&ved=0ahUKEwiJyK-ss6fJAhVJqB4KHdH0CzoQFggdMAA&url=http%3A%2F%2Fwww.records.cityofsacramento.org%2FViewDoc.aspx%3FID%3Ds6tFBnt4W%2BLfATkSvQtxU3cPMH8Ffsmb&usg=AFQjCNHqKlgUP7okeP_W5LG4poCU_stYsA&sig2=dIyILU_ax0aO-gcFfQERRw&bvm=bv.108194040,d.eWE.

[33] *See id.*

[34] *See Regular Meeting Announcement and Summary Agenda*, Lake County Water Authority (Oct. 28, 2009) at 5-6, http://www.lcwa.org/assets/min09-10-28-summ-info.pdf.

2010.[35]  The second lowest bidder on Liquid Alum for that contract was $385.00 per dry ton—

43% higher.[36]

60.    In June 2010, General Chemical was the lowest bidder on a Liquid Alum bid to

Emerald Coast Utilities Authority, at $212.93 per 1,000 dry tons.[37]  While the second lowest

bidder, Southern Ionics, Inc., bid $219.00 per 1,000 dry tons, the third and fourth bidders, GEO

Specialty Chemicals, Inc. and C & S Chemicals, Inc., bid $463.50 and $558.00 respectively—

over twice the amount of General Chemical's bid.[38]

61.    Rather than honestly competing in the Liquid Alum market, Defendants and their

co-conspirators colluded to rig bids and conspired to artificially fix, maintain, stabilize and/or

inflate prices in the Liquid Alum market.

62.    As a result of Defendants' and their co-conspirators' unlawful collusion,

competition between the manufacturers and/or distributors of Liquid Alum in the United States

was artificially suppressed by Defendants to the detriment of Plaintiffs and members of the

Class, who were forced to pay artificially inflated prices for Liquid Alum.

C.    **Defendant Reichl Pleads Guilty to Antitrust Violations**

63.    Defendant Reichl is the former Vice President of Sales of General Chemical.[39]

As detailed in the Information, from approximately December 2006 through 2010, Reichl was

---

[35] *See id.*

[36] *See id.*

[37] *See Bid Number 2010-15,* Emerald Coast Utilities Authority (June 16, 2010),
http://www.ecua.fl.gov/system/pdfs/42/original/Bid%20Tab%202010%2015%20Liquid%20Alum.pdf?1302801089.

[38] *See id.*

[39] *See* Leah Nylen & Joshua Sisco, *Former Chemical Executive Pleads Guilty to Fixing Prices of Liquid Aluminum Sulfate,*  Mlex (Oct. 27, 2015),

employed as Vice President of Sales and Marketing for an unidentified company that manufactured and supplied water treatment and other chemicals.  *See* Information at ¶¶ 3-4.  This unidentified company is a co-conspirator in the conspiracy alleged herein.  Reichl is currently employed as the Vice President of Sales and Marketing for Affinity Chemical.[40]

64.    In his roles, Reichl "oversaw the sale and marketing of water treatment chemicals, including liquid aluminum sulfate, and was responsible for pricing and strategy, analyzing proposals, determining prices, approving bid and price proposals and supervising sales and marketing employees."  Information at ¶ 4.

65.    On October 27, 2015, the DOJ announced that Defendant Reichl pled guilty to engaging in a conspiracy to manipulate the Liquid Alum market in the United States through, *inter alia*, agreeing with co-conspirators to participate in bid-rigging and price-fixing in order to artificially increase prices for Liquid Alum and reap supra-competitive profits.  *See, e.g,* DOJ Press Release.

66.    The DOJ charged Defendant Reichl with unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for his collusive and anticompetitive conduct during the Class Period.  According to the Information, Defendant Reichl and his co-conspirators colluded and manipulated the market for Liquid Alum by:

- discussing their Liquid Alum business in New Jersey and elsewhere;

- agreeing not to pursue each other's historical customers;

---

http://www.mlex.com/PlaintiffLitigation/DetailView.aspx?cid=731089&siteid =188&rdir=1.

[40] *See* Leah Nylen & Joshua Sisco, *Former Chemical Executive Pleads Guilty to Fixing Prices of Liquid Aluminum Sulfate*,  Mlex (Oct. 27, 2015),
http://www.mlex.com/PlaintiffLitigation/DetailView.aspx?cid=731089&siteid =188&rdir=1.

- tracking bid and pricing history to determine co-conspirators' historical customers and to determine which accounts of co-conspirators to submit intentionally losing or "throw-away" bids;

- submitting intentionally losing or "throw-away" bids to co-conspirators' accounts;

- discussing prices or bids to be quoted to customers;

- withdrawing inadvertently winning bids;

- submitting losing bids to their own accounts if they inadvertently won a bid on a co-conspirator's account;

- instructing employees on how to quote or bid in accordance with the conspiracy; and

- submitting artificially inflated bids to their own customers.

Information at ¶ 13.

67.     According to the DOJ Press Release, Defendant Reichl admitted to agreeing with co-conspirators not to compete for contracts for Liquid Alum.  "By agreeing not to disturb each other's 'historical' business, Reichl and his co-conspirators cheated municipalities and paper companies out of competitive prices for their supplies of liquid aluminum sulfate, a key water treatment chemical."  DOJ Press Release.

68.     Moreover, "Reichl and his co-conspirators colluded to circumvent competitive bidding and independent pricing for liquid aluminum sulfate contracts, and conspired to raise prices by submitting artificially inflated bids to their customers. . . . They also allocated customers in furtherance of their collusive scheme.  By agreeing to violate both the spirit and the letter of the competitive process, Reichl and others defrauded municipalities as well as pulp and paper companies out of millions of dollars."  DOJ Press Release.

69.     Reichl was the first Defendant to plead guilty to what the DOJ called a "decade-and-a-half-long conspiracy."  DOJ Press Release.

70.     General Chemical has been cooperating with the DOJ in exchange for amnesty from prosecution for criminal charges related to its role in the conspiracy alleged herein.[41] Defendant Chemtrade Logistics Fund admitted to cooperating with the DOJ investigation in exchange for amnesty in its 2014 Annual Information Form, stating:

> Chemtrade is currently a subject of an ongoing investigation by the U.S. Department of Justice concerning alleged anticompetitive conduct in the water treatment chemicals industry. Chemtrade is cooperating with the investigation and has the benefit of the conditional amnesty from the U.S. Department of Justice for its conduct regarding sales of the water treatment chemicals under investigation which General Chemical had obtained prior to the General Chemical Acquisition. The investigation may result in separate civil litigation being initiated against Chemtrade.  In addition, there is a risk that Chemtrade could become ineligible for a period of time to do business or bid for new contracts with certain municipal or other government customers as a consequence of its conduct, and thereby could lose some or all of its municipal and other government water treatment chemicals business in certain jurisdictions for a period of time.[42]

## II.     PLAINTIFFS AND MEMBERS OF THE CLASS WERE INJURED AS A RESULT OF DEFENDANTS' CONDUCT

71.     Plaintiffs and Class members are direct purchasers of Liquid Alum.

72.     Defendants and their co-conspirators specifically intended to, and did cause, unlawful and artificial manipulation of the market for Liquid Alum, and their conduct injured

---

[41] *See* Leah Nylen & Joshua Sisco, *Former Chemical Executive Pleads Guilty to Fixing Prices of Liquid Aluminum Sulfate*,  Mlex (Oct. 27, 2015), http://www.mlex.com/PlaintiffLitigation/DetailView.aspx?cid=731089&siteid=188&rdir=1.

[42] *See Chemtrade Logistics Income Fund Annual Information Form for the year ended December 31, 2014* (March 5, 2015) at 40-41, http://www.chemtradelogistics.com/main/wp-content/uploads/CHEUN_Annual_Information_Form2014.pdf .

competition and Plaintiffs and Class members who paid artificially inflated prices for Liquid Alum during the Class Period.

73.     As alleged herein, Defendants' and their co-conspirators' collusion had the following effects on the Liquid Alum market and has caused injury to Plaintiffs and the Class in the following ways, *inter alia*:

    a.    During the Class Period, Defendants' unlawful anticompetitive conduct has restrained price competition among Defendants in the sale of Liquid Alum to purchasers in the United States;

    b.    During the Class Period, prices for Liquid Alum sold by Defendants to purchasers in the United States—including Plaintiffs and members of the Class—have been fixed, maintained, stabilized and/or artificially inflated to non-competitive levels;

    c.    During the Class Period, the supply of Defendants' Liquid Alum for sale to purchasers in the United States has been artificially restrained; and

    d.    During the Class Period, purchasers of Liquid Alum in the United States—including Plaintiffs and members of the Class—have been deprived of the benefit of free and open competition on the basis of price in the market for Liquid Alum.

74.     As a direct and proximate result of Defendants' anticompetitive and unlawful conduct, Plaintiffs and Class members have been injured because they paid artificially inflated prices for Liquid Alum purchased directly from Defendants, which were higher than prices they would have paid absent Defendants' and their co-conspirators' collusive and illegal conduct.

75.     Plaintiffs and Class members have been harmed in the amounts they overpaid as a result of Defendants' and their co-conspirators' unlawful anticompetitive conduct and in an amount to be determined at trial.

### III.    AFFECTED TRADE AND COMMERCE

76.    During the Class Period, Defendants controlled the United States markets for Liquid Alum.   Defendants, directly or through one or more of their respective parents, subsidiaries, agents, or affiliates, sold or delivered Liquid Alum to purchasers in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

77.    Defendants engaged in collusive conduct inside the United States that caused intended, direct, substantial and reasonably foreseeable anticompetitive effects upon interstate commerce within the United States, including within this District.

78.    To the extent any Liquid Alum purchased by Class members does not constitute domestic or import commerce, the Defendants' unlawful anticompetitive conduct had, and continues to have, a direct, substantial and reasonably foreseeable effect on United States commerce, including within this District.

79.    As alleged herein, Defendants intentionally, substantially and foreseeably affected commerce throughout the United States and harmed Plaintiffs and Class members.  Defendants, directly and through their respective parents, subsidiaries, agents, affiliates, successors and predecessors knowingly and intentionally engaged in conduct affecting all states, including artificially fixing, maintaining, stabilizing and/or artificially inflating prices in the United States market for Liquid Alum.  Defendants' conspiracy artificially inflated prices for Liquid Alum in the United States, and restrained trade in the United States.

80.    Defendants' collusive and anticompetitive conduct and its effect on United States commerce proximately caused antitrust injury to Plaintiffs and Class members in the United States.   Defendants' anticompetitive conduct caused Plaintiffs and Class members to pay artificially inflated and supra-competitive prices for Liquid Alum purchased from the

Defendants.  The effects of Defendants' anticompetitive conduct were intended and anticipated by Defendants as the natural and predictable consequences of Defendants' and their co-conspirators' collusion.

## FRAUDULENT CONCEALMENT AND
## TOLLING OF THE STATUTE OF LIMITATIONS

81.     Plaintiffs and members of the Class had no knowledge of the combination and/or conspiracy alleged herein, or of facts sufficient to establish constructive knowledge of the claims set forth herein, and could not discover the antitrust violations alleged herein through exercise of reasonable diligence until, at the earliest, October 27, 2015, when the existence of an investigation by the United States Department of Justice into the Liquid Alum market was first made public.

82.     Defendants' conspiracy was, by its very nature, secretive and self-concealing. Defendants engaged in a form of market manipulation which could not be detected by Plaintiffs or members of the Class.  Defendants' conspiracy was of a secret nature and Defendants relied on non-public methods of communication to collude with each other and co-conspirators to artificially fix, maintain, stabilize and/or inflate the prices of Liquid Alum sold in the United States at noncompetitive prices during the Class Period.  The secret nature of the conspiracy and Defendants' intentional concealment of the conspiracy precluded Plaintiffs and members of the Class from uncovering Defendants' unlawful conduct alleged herein.

83.     Defendants and their co-conspirators actively conspired to conceal their unlawful conduct.  Throughout the Class Period, Defendants and their co-conspirators, both individually and in concert, actively participated in the concealment of their unlawful conduct by, *inter alia*, misrepresenting the basis for the pricing of Liquid Alum sold in the United States.

84.     As a result of the self-concealing nature of Defendants' conduct, as well as Defendants' fraudulent and affirmative concealment of the alleged combination and/or conspiracy, Plaintiffs and members of the Class could not have discovered the alleged combination and/or conspiracy at an earlier date through the exercise of reasonable diligence.

85.     As such, the statute of limitations applicable to the claims of Plaintiffs and members of the Class has been tolled and did not begin to run until, at the earliest, October 27, 2015.

## CLASS ALLEGATIONS

86.     Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, seeking monetary damages on behalf of the following class (the "Class"):

> All persons or entities in the United States that purchased Liquid Aluminum Sulfate directly from any Defendant or any Defendant's current or former subsidiaries, agents, affiliates or joint ventures between January 1, 1997 and July 31, 2010.

87.     Excluded from the proposed Class are: (1) Defendants; (2) Defendants' officers, directors, management and employees, and their immediate families; (3) Defendants' current and former subsidiaries, agents, affiliates and joint ventures; (4) all governmental entities; and (5) any judicial officer assigned to this case and their immediate families.

88.     While Plaintiffs do not know the exact number of Class members, Plaintiffs believe that there are at least hundreds of members of the Class described above, making the Class so numerous and geographically dispersed that joinder of all members of the Class is impracticable.

89.     There are questions of law and fact common to each member of the Class that relate to the existence of the combination and/or conspiracy alleged herein and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.     whether Defendants and their co-conspirators engaged in a combination and/or conspiracy to artificially fix, maintain, stabilize and/or inflate the prices of Liquid Alum sold in the United States during the Class Period;

b.     whether Defendants and their co-conspirators engaged in bid rigging during the Class Period;

c.     the duration of the alleged combination and/or conspiracy and the identity of the participants in the alleged combination and/or conspiracy;

d.     whether Defendants concealed the alleged combination and/or conspiracy from Plaintiffs and members of the Class;

e.     whether the alleged combination and/or conspiracy violated the Sherman Antitrust Act;

f.     whether Defendants' conduct caused the prices of Liquid Alum sold in the United States during the Class Period to be artificially fixed, maintained, stabilized and/or inflated to noncompetitive prices;

g.     whether Plaintiffs and members of the Class were injured as result of Defendants' conduct; and

h.     the appropriate measure of damages incurred by Plaintiffs and Class members.

90.     Plaintiffs' claims are typical of the claims of the Class.   As alleged herein, Plaintiffs and members of the Class each sustained damages arising out of the same course of unlawful conduct by Defendants and their co-conspirators.

91.     Plaintiffs are willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to, or which conflict with, the interests of the other members of the Class.

92.     Plaintiffs' interests are co-extensive with, and not antagonistic to, the interests of the absent Class members.  Plaintiffs will undertake to represent and protect the interests of the absent Class members.

93.     Plaintiffs have engaged the services of the undersigned counsel.  Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and the absent Class members.

94.     Class action status is warranted under Rule 23(b) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

## COUNT I
## VIOLATION OF SECTIONS 1 AND 3 OF
## THE SHERMAN ANTITRUST ACT, 15 U.S.C. §§ 1, 3

95.     Plaintiffs repeat the allegations set forth in the above paragraphs as if fully set forth herein.

96.     During the Class Period, Defendants and their co-conspirators entered into and engaged in a combination and/or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3.

97.     Defendants were competitors in the market for Liquid Alum sold in the United States, and combined and/or conspired with each other and their co-conspirators to artificially

fix, raise, maintain and/or stabilize the prices of Liquid Alum sold in the United States at noncompetitive prices.

98.     As a result of Defendants' conduct, the prices of Liquid Alum sold in the United States were artificially fixed, maintained, stabilized and/or inflated to noncompetitive prices during the Class Period.

99.     Defendants' combination and/or conspiracy constitute *per se* violations of Sections 1 and 3 of the Sherman Act.  The alleged combination and/or conspiracy involved joint coordination among horizontal competitors to affect the prices of Liquid Alum sold in the United States.  There is no legitimate business justification for, nor are any procompetitive benefits caused by, Defendants' combination and/or conspiracy and the acts taken in furtherance thereof. Any ostensible procompetitive benefits of the combination and/or conspiracy were pretextual and could have been achieved by less restrictive means.

100.     Further, Defendants engaged in a conspiracy consisting of a continued understanding between co-conspirators and effectuated their conspiracy through concerted action among Defendants and their co-conspirators, including, *inter alia*: (1) participating in meetings to discuss each other's Liquid Alum business; (2) agreeing to "stay away" from each other's customers; (3) submitting "throw away" bids to co-conspirators' customers: (4) discussing prices to be quoted and bids to be submitted to customers; (5) withdrawing inadvertently winning bids; (6) submitting losing bids to their own customers when they inadvertently won a bid for a co-conspirator's customer; and (7) instructing employees how to submit bids and quote prices to remain consistent with the agreement of the conspiracy.

101.     As a direct, material and proximate result of Defendants' violations of Section 1 and 3 of the Sherman Antitrust Act, Plaintiffs and members of the Class have suffered injury to

their business and property, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a), by paying more for Liquid Alum throughout the Class Period than they otherwise would have paid in the absence of Defendants' combination and/or conspiracy.

102.   Plaintiffs and members of the Class are entitled to treble damages for Defendants' violations of Sections 1 and 3 of the Sherman Antitrust Act, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

**WHEREFORE**, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class, and award the following relief:

a.   certify this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Class and Plaintiffs' counsel as counsel for the Class;

b.   find Defendants' conduct alleged herein violates Sections 1 and 3 of the Sherman Antitrust Act;

c.   award Plaintiffs and members of the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15 (a);

d.   award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law; and

e.   direct any such further relief that the Court may deem just and proper.

Respectfully submitted,

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.

__/s/ James E. Cecchi_____

KESSLER TOPAZ

MELTZER & CHECK, LLP
Joseph H. Meltzer
Kimberly A. Justice
Naumon A. Amjed
Melissa L. Troutner
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

*Attorneys for Plaintiffs City of Texarkana, Arkansas
and City of Texarkana, Texas d/b/a Texarkana
Water Utilities*

KEIL & GOODSON P.A.
Matt Keil
John C. Goodson
406 Walnut Street
Texarkana, Arkansas 71854
(870) 772-4113

*Additional counsel for Plaintiffs City of Texarkana,
Arkansas and City of Texarkana, Texas d/b/a
Texarkana Water Utilities*

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: November 24, 2015    Respectfully submitted,

            CARELLA, BYRNE, CECCHI,
            OLSTEIN, BRODY & AGNELLO, P.C.


             /s/ James E. Cecchi    

            KESSLER TOPAZ
              MELTZER & CHECK, LLP
            Joseph H. Meltzer
            Kimberly A. Justice
            Naumon A. Amjed
            Melissa L. Troutner
            280 King of Prussia Road
            Radnor, PA 19087
            (610) 667-7706

            *Attorneys for Plaintiffs City of Texarkana, Arkansas*
            *and City of Texarkana, Texas d/b/a Texarkana*
            *Water Utilities*

            KEIL & GOODSON P.A.
            Matt Keil
            John C. Goodson
            406 Walnut Street
            Texarkana, Arkansas 71854
            (870) 772-4113

            *Additional counsel for Plaintiffs City of Texarkana,*
            *Arkansas and City of Texarkana, Texas d/b/a*
            *Texarkana Water Utilities*

# EXHIBIT A

C4

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :     Criminal No. *15 cr 554*

                                    :

            v.                      :     Filed:

                                    :

FRANK A. REICHL,                    :     Violation: 15 U.S.C. § 1

                                    :

                Defendant.          :

                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLEA AGREEMENT

The Antitrust Division of the United States Department of Justice and the defendant, FRANK A. REICHL ("REICHL" or "defendant") hereby enter into the following Plea Agreement ("Agreement") pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P.").

## AGREEMENT TO PLEAD GUILTY
## AND WAIVE CERTAIN RIGHTS

1.      REICHL will waive indictment pursuant to Fed. R. Crim. P. 7(b) and plead guilty in the United States District Court for the District of New Jersey to a one-count Information, in the form attached, in which he is charged with one count of violating 15 U.S.C. § 1 in connection with a combination and conspiracy to suppress and eliminate competition in the sale and marketing of liquid aluminum sulfate by agreeing to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of, liquid aluminum sulfate sold to municipalities and pulp

and paper companies in the United States from at least as early as 1997 and continuing until approximately July 2010.

2.    REICHL has entered into a waiver of the statute of limitations to allow him to be charged as described in the Information and this Plea Agreement.  REICHL knowingly and intentionally, and with advice of counsel, waives any defense arising from the computation of time related to any applicable statute of limitations arising from this violation.

3.    As set forth in Schedule A, which is hereby made a part of this Plea Agreement, REICHL knowingly and voluntarily agrees to waive the right to file any appeal, collateral attack, or other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, that challenges the sentence imposed by the Court if that sentence falls within or below the agreed United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") offense level set forth therein, regardless of how the sentence is determined by the Court.  REICHL agrees that there is currently no known evidence of ineffective assistance of counsel or prosecutorial misconduct.

<u>DEFENDANT'S COOPERATION</u>

4.    REICHL will cooperate fully and truthfully with the United States in the prosecution of this case, the current federal investigation of violations of federal antitrust and related criminal laws involving the sale and marketing of liquid aluminum sulfate in the United States, any other federal investigation resulting therefrom, and any litigation or other proceedings arising or resulting from any such investigation to which the United States is a party (collectively referred to herein as "Federal Proceeding").  Federal Proceeding includes, but is not limited to, an investigation, prosecution, litigation, or other proceeding regarding obstruction of, the making of a false statement or declaration in, the commission of perjury or subornation of perjury in, the

2

commission of contempt in, or conspiracy to commit such offenses in, a Federal Proceeding. The full, truthful, and continuing cooperation of REICHL shall include, but is not limited to:

  a. producing to the United States all non-privileged documents, information, and other materials, wherever located, in his possession, custody, or control, requested by the United States in connection with any Federal Proceeding;

  b. bringing to the attention of the United States all crimes which he has committed, and all administrative, civil, and/or criminal proceedings, investigations or prosecutions in which he, to his knowledge, is or has been a subject, target, party, or witness;

  c. responding fully and truthfully to all inquiries of the United States in connection with any Federal Proceeding, without falsely implicating any person or intentionally withholding any information, subject to the penalties of making false statements (18 U.S.C. § 1001) and obstruction of justice (18 U.S.C. § 1503, *et seq.*);

  d. otherwise voluntarily providing to the United States any material or information, not requested in subparagraphs a to c of this paragraph, that is related to any Federal Proceeding;

  e. when called upon to do so by the United States in connection with any Federal Proceeding, testifying in grand jury, trial, and other judicial proceedings fully, truthfully, and under oath, subject to the penalties of perjury (18 U.S.C. § 1621), making a false statement or declaration in grand jury or court proceedings (18 U.S.C. § 1623), contempt (18 U.S.C. §§ 401 - 402), and obstruction of justice (18 U.S.C. § 1503, *et seq.*); and

  f. committing no further crimes whatsoever.

## GOVERNMENT'S AGREEMENT

5.      Subject to REICHL's full, truthful, and continuing cooperation, as described in Paragraph 4 of this Plea Agreement, and upon the Court's acceptance of the guilty plea called for by this Plea Agreement, the United States will not bring further criminal charges against REICHL for any act or offense committed prior to the date of signature of this Plea Agreement that was in furtherance of any agreement to rig bids and allocate customers for, and to fix the price of, liquid aluminum sulfate supplied to municipalities and pulp and paper companies in the United States ("Relevant Offense").  The nonprosecution terms of this paragraph do not apply to civil matters of any kind, to any violation of the federal tax or securities laws or conspiracy to commit such offenses, or to any crime of violence.

6.      It is understood that this Agreement does not bind any other federal agency or local prosecuting authority or administrative agency other than the Antitrust Division of the United States Department of Justice.  However, if requested, the United States will bring the fact, manner, and extent of REICHL's cooperation to the attention of other prosecuting, administrative, and other agencies as a matter for such agencies to consider as appropriate.

## POSSIBLE MAXIMUM PENALTIES

7.      REICHL understands that the statutory maximum penalty which may be imposed against him upon conviction for a violation of Section One of the Sherman Antitrust Act is:

a.      a term of imprisonment for ten (10) years (15 U.S.C. § 1);

b.      a fine in an amount equal to the greatest of (1) $1 million, (2) twice the gross pecuniary gain the conspirators derived from the crime, or (3) twice the gross pecuniary loss caused to the victims of the crime by the conspirators (15 U.S.C. § 1 and 18 U.S.C. § 3571(b) and(d));

    c.    a term of supervised release of three (3) years following any term of imprisonment. If the defendant violates any condition of supervised release, he could be imprisoned up to two (2) years (18 U.S.C. § 3559(a)(3), 18 U.S.C. § 3583(b)(2) and (e)(3), and U.S.S.G. § 5D1.2(a)(2)).

8.    In addition, REICHL understands that:

    a.    pursuant to U.S.S.G § 5E1.1 or 18 U.S.C. § 3583(d), the Court may impose an order of restitution to the victims of the offense; and

    b.    pursuant to 18 U.S.C. § 3013(a)(2)(A), the Court is required to order the defendant to pay a $100 special assessment upon conviction for the charged crime.

## SENTENCING GUIDELINES

9.    REICHL understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Sentencing Guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a), in determining and imposing a sentence. REICHL understands that the Court will make Sentencing Guidelines determinations by a preponderance of the evidence standard. REICHL understands that although the Court is not ultimately bound to impose a sentence within the applicable Sentencing Guidelines range, its sentence must be reasonable based upon considerations of all relevant sentencing factors set forth in 18 U.S.C. § 3553(a).

## SENTENCING AGREEMENT

10.    The United States and Reichl agree to stipulate at sentencing to the statements set forth in the attached Schedule A.

11.    REICHL understands that the sentence to be imposed on him is within the sole discretion of the sentencing judge. It is understood that the Sentencing Guidelines are not binding on the Court. REICHL acknowledges that the entry of his guilty plea to the charged

offense authorizes the sentencing judge to impose any sentence up to and including the statutory maximum sentence. The United States cannot and does not make any promises or representations as to what sentence REICHL will receive. REICHL understands that, as provided in Fed. R. Crim. P. 11(c)(3)(B), if the Court does not impose a sentence consistent with either party's sentencing recommendation, he nevertheless has no right to withdraw his plea of guilty. The United States will inform the Probation Office and the Court of (a) this Plea Agreement; (b) the nature and extent of REICHL's activities with respect to this case, and all other activities of REICHL which the United States deems relevant to sentencing; and (c) the timeliness, nature, extent and significance of REICHL's cooperation with the United States. In so doing, the United States may use any information it deems relevant, including information provided by REICHL both prior and subsequent to the signing of this Plea Agreement. The United States reserves the right to make any statement to the Court or the Probation Office concerning the nature of the offense charged in the attached Information, the participation of REICHL therein, and any other facts or circumstances that it deems relevant. The United States also reserves the right to comment on or to correct any representation made by or on behalf of REICHL, and to supply any other information that the Court may require.

12.     If the United States determines that REICHL has provided substantial assistance in any Federal Proceeding, and has otherwise fully complied with all of the terms of this Agreement, it will file a motion, pursuant to U.S.S.G. § 5K1.1, advising the sentencing judge of all relevant facts pertaining to that determination and requesting the Court to sentence REICHL in light of the factors set forth in U.S.S.G. § 5K1.1(a)(1)-(5), and thus impose, in the Court's discretion, a sentence below the applicable Sentencing Guidelines ranges for a term of

incarceration and/or a fine. The United States and REICHL are free to recommend or argue for any specific sentence to the Court.

13.     REICHL acknowledges that the decision whether he has provided substantial assistance in any Federal Proceeding is within the sole discretion of the United States. It is understood that should the United States determine that REICHL has not provided substantial assistance in any Federal Proceeding, such a determination will release the United States from any obligation to file a motion pursuant to U.S.S.G. § 5K1.1, but will not entitle REICHL to withdraw his guilty plea once it has been entered. REICHL further understands that whether or not the United States files its motion pursuant to U.S.S.G. § 5K1.1, the sentence to be imposed on him remains within the sole discretion of the sentencing judge.

14.     In light of the availability of civil causes of action, in the District of New Jersey and elsewhere, which potentially provide for a recovery of a multiple of actual damages, the United States and REICHL agree that any sentencing recommendation either party may make to the Court will not include an order of restitution for the offense charged in the Information.

15.     REICHL understands that this Agreement does not in any way affect or limit the right of the United States to respond to and take positions on post-sentencing motions or requests for information that relate to the reduction or modification of its sentence.

## REPRESENTATION BY COUNSEL

16.     REICHL has reviewed all legal and factual aspects of this case with his attorney and is fully satisfied with his attorney's legal representation. REICHL has thoroughly reviewed this Agreement with his attorney, and has received satisfactory explanations from his attorney concerning each paragraph of this Agreement and alternatives available to him other than

entering into this Agreement. After conferring with his attorney and considering all available alternatives, REICHL has made a knowing and voluntary decision to enter into this Agreement.

## VOLUNTARY PLEA

17.    REICHL's decision to enter into this Agreement and to tender a plea of guilty is freely and voluntarily made and is not the result of force, threats, assurances, promises, or representations other than the representations contained in this Agreement. The United States has made no promises or representations to REICHL as to whether the Court will accept or reject the recommendations contained within this Agreement.

## VIOLATION OF PLEA AGREEMENT

18.    REICHL agrees that, should the United States determine in good faith, during the period that any Federal Proceeding is pending, that he has violated any provision of this Plea Agreement, the United States will notify counsel for the defendant in writing by personal or overnight delivery, facsimile transmission, or electronic mail, and may also notify counsel by telephone of its intention to void any of its obligations under this Plea Agreement (except its obligations under this paragraph), and REICHL shall be subject to prosecution for any federal crime of which the United States has knowledge including, but not limited to, the substantive offenses relating to the investigation resulting in this Plea Agreement. REICHL agrees that, in the event that the United States is released from its obligations under this Plea Agreement and brings criminal charges against him for any offense referred to in Paragraph 1 of this Plea Agreement, the statute of limitations period for such offense shall be tolled for the period between the date of the signing of this Plea Agreement and six (6) months after the date the United States gave notice of its intent to void its obligations under this Plea Agreement.

19.     REICHL understands and agrees that in any further prosecution of him resulting from the release of the United States from its obligations under this Plea Agreement based on his violation of the Plea Agreement, any documents, statements, information, testimony, or evidence provided by him to attorneys or agents of the United States, federal grand juries, or courts, and any leads derived therefrom, may be used against him in any such further prosecution. In addition, REICHL unconditionally waives his right to challenge the use of such evidence in any such further prosecution, notwithstanding the protections of Fed. R. Evid. 410.

<u>ENTIRETY OF AGREEMENT</u>

20.     This Plea Agreement constitutes the entire agreement between the United States and REICHL concerning the disposition of the criminal charge contained in this case. This Plea Agreement cannot be modified except in writing, signed by the parties.

21.     The undersigned attorneys for the United States have been authorized by the Attorney General of the United States to enter this Plea Agreement on behalf of the United States.

Respectfully submitted,

Dated: *September 29, 2015*

_____
FRANK A. REICHL

_____
MICHAEL B. HIMMEL, ESQ.
Counsel for FRANK A. REICHL

_____
PATRICIA L. JANNACO
MARY ANNE F. CARNIVAL
FRANK A. CAVANAGH
Trial Attorneys, Antitrust Division
United States Department of Justice
26 Federal Plaza, Suite 3630
New York, New York 10278
Tel:    (212) 335-8034
Fax:    (212) 335-8023
Email: patricia.jannaco@usdoj.gov

9

## PLEA AGREEMENT WITH FRANK A. REICHL

### SCHEDULE A

1.    The United States and FRANK A. REICHL ("REICHL") recognize that the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") are not binding on the Court.  The United States and REICHL nevertheless agree to the stipulations set forth herein, and agree that the Court should sentence REICHL in accordance with those stipulations.

2.    The version of the Sentencing Guidelines effective November 1, 2014 applies in this case.

3.    The offense with which REICHL is charged is a violation of 15 U.S.C. § 1.  The applicable guideline for that offense is U.S.S.G. § 2R1.1, which carries a Base Offense Level of 12.

4.    Specific Offense Characteristic U.S.S.G. § 2R1.1(b)(1) applies in that the conduct involved an agreement to submit noncompetitive bids.  The offense level is therefore increased by 1 level.

5.    Specific Offense Characteristic U.S.S.G § 2R1.1(b)(2)(D) applies because the volume of commerce attributable to REICHL is more than $100 million. This amount includes liquid aluminum sulfate contracts awarded to his employer that were subject to the conspiracy to which he will plead guilty pursuant to this Plea Agreement.  The offense level is therefore increased by 8 levels.

6.    An adjustment pursuant to U.S.S.G. § 3B1.1(c) applies because of  REICHL's aggravating role in the offense as an organizer, leader, manager, or supervisor in the criminal activity.  The offense level is therefore increased by 2 levels.

7.     The adjusted offense level is 23.

8.     As of the date of this Plea Agreement, REICHL has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the offense charged. Therefore, a downward adjustment of 2 levels for acceptance of responsibility is appropriate if REICHL's acceptance of responsibility continues through the date of sentencing.  See U.S.S.G. § 3E1.1(a).

9.     As of the date of this Plea Agreement, REICHL has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently.  At sentencing, the United States will move for a further one-point reduction in REICHL's offense level pursuant to U.S.S.G. § 3E1.1(b) if the following conditions are met:  (a) REICHL enters a plea pursuant to this agreement, (b) the United States in its discretion determines that REICHL's acceptance of responsibility has continued through the date of sentencing and REICHL, therefore, qualifies for a two-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), and (c) REICHL's offense level under the Guidelines prior to the operation of  U.S.S.G. § 3E1.1(a) is 16 or greater.

10.     In accordance with the above, the parties agree that the total Sentencing Guidelines offense level applicable to REICHL is 20 (the "agreed total Sentencing Guidelines offense level").

11.     The parties agree that a sentence within the Sentencing Guidelines range that results from the agreed total Sentencing Guidelines offense level is reasonable.

12.     REICHL knows that, except as noted below in this paragraph, he voluntarily waives, the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, which challenges the sentence imposed by the sentencing court if that sentence falls within or below the Sentencing Guidelines range that results from the agreed total Sentencing Guidelines offense level of 20.  The parties reserve any right they may have under 18 U.S.C. § 3742 to appeal the sentencing court's determination of the criminal history category.  The provisions of this paragraph are binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein.  Furthermore, if the sentencing court accepts any stipulation contained herein, both parties waive the right to file an appeal, collateral attack, writ, or motion claiming that the sentencing court erred in doing so.

13.     Both parties reserve the right to oppose or move to dismiss any appeal, collateral attack, writ, or motion barred by the preceding paragraph and to file or to oppose any appeal, collateral attack, writ, or motion not barred by the preceding paragraph.

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

           v.

FRANK A. REICHL,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

Criminal No. *15 cr 554*

Filed:

Violation: 15 U.S.C. § 1

## INFORMATION

The United States of America, acting through its attorneys, charges:

1.    FRANK A. REICHL ("REICHL") is hereby made a defendant on the charge stated below:

## SHERMAN ACT CONSPIRACY
(15 U.S.C. § 1)

## RELEVANT PARTIES AND ENTITIES

2.    At all times relevant to this Information, Company 1 was a corporation existing under the laws of Delaware, with its principal place of business in Parsippany, New Jersey. Company 1 was a manufacturer and supplier of water treatment and other chemicals, including liquid aluminum sulfate, for use by municipalities and pulp and paper companies in the District of New Jersey and elsewhere.

3.    Defendant REICHL is a resident of Flanders, New Jersey. At all times relevant to this Information, REICHL was employed by Company 1. During the period relevant to this

Information, REICHL held positions in which he was responsible for the sale and marketing of water treatment chemicals, including liquid aluminum sulfate, except for the period from approximately July 2005 to approximately December 2006, when he was employed in other components of Company 1 that were not engaged in the sale and marketing of water treatment chemicals.

4. Prior to July 2005, REICHL was General Manager of Water Chemicals. After approximately December 2006 until the termination of his employment with Company 1 in 2010, REICHL was Vice President of Sales and Marketing. As both General Manager and Vice President, REICHL oversaw the sale and marketing of water treatment chemicals, including liquid aluminum sulfate, and was responsible for pricing and strategy, analyzing proposals, determining prices, approving bid and price proposals, and supervising other sales and marketing employees of Company 1.

5. Various other persons and entities, not named as defendants herein, participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof. Whenever in the Information reference is made to any act, deed, or transaction of any corporation, such allegation shall be deemed to mean that the corporation engaged in such act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

## BACKGROUND

6. Liquid aluminum sulfate is a coagulant used to remove impurities and other substances from water. The principal customers for liquid aluminum sulfate are municipalities, which use it in potable water and wastewater treatment, and pulp and paper manufacturers which

2

use it in their manufacturing processes.

7.  Municipalities usually acquire their supplies of liquid aluminum sulfate through a publicly-advertised competitive bidding process. Municipal contracts for liquid aluminum sulfate are usually one year in duration, although some contracts provide for renewal for a period of time. The results of municipal bidding processes are typically made public.

8.  Pulp and paper manufacturers usually acquire their supplies of liquid aluminum sulfate pursuant to requests for price issued to suppliers of liquid aluminum sulfate. The terms of the resulting contracts are subject to negotiation between the suppliers who respond to requests for price and the pulp and paper manufacturers. Contracts for supply of liquid aluminum sulfate to pulp and paper manufacturers may last for a year or more. The results of the negotiations between the liquid aluminum suppliers and the pulp and paper manufacturers are typically not made public.

9.  Liquid aluminum sulfate is sold by the ton. Supplies of liquid aluminum sulfate are transported to the customer by rail or truck from the manufacturing plant of the supplier that is closest to the customer. The cost of freight is a significant component of the price of liquid aluminum sulfate charged to municipal customers and pulp and paper manufacturers.

10.  One factor suppliers of liquid aluminum sulfate consider in deciding whether to bid or quote on a contract is whether the business is "freight logical," that is, whether the liquid aluminum sulfate supplier can make a profit on the business taking into account the distance from the supplier's plant to the customer and the corresponding cost of freight.

## DESCRIPTION OF THE OFFENSE

11.  From at least as early as 1997 and continuing until approximately July 2010, the exact dates being unknown to the United States, in the District of New Jersey and elsewhere,

3

REICHL and his co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the sale and marketing of liquid aluminum sulfate by agreeing to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of liquid aluminum sulfate sold to municipalities and pulp and paper companies in the United States. The combination and conspiracy engaged in by REICHL and his co-conspirators was in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

12.     The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among REICHL and his co-conspirators, the substantial terms of which were to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of liquid aluminum sulfate sold to municipalities and pulp and paper companies in the United States.

<u>MEANS AND METHODS OF THE CONSPIRACY</u>

13.     For the purpose of forming and carrying out the charged combination and conspiracy, REICHL and his co-conspirators did those things that they combined and conspired to do, including, among other things:

a.      participating in meetings and conversations in the District of New Jersey and elsewhere to discuss each other's liquid aluminum sulfate business;

b.      agreeing to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

c.      tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator or other supplier of liquid aluminum sulfate, so as to determine whether to pursue a particular contract or to submit an intentionally losing or

"throw away" bid or price quotation;

       d.     submitting intentionally losing or "throw away" bids or price quotations to each other's "historic" liquid aluminum sulfate customers;

       e.     from time to time, in the District of New Jersey and elsewhere, discussing the price to be quoted to a customer by the intended winner to determine the amount of the intended loser's intentionally losing or "throw away" bid or price quotation;

       f.     from time to time, upon request of a co-conspirator, withdrawing inadvertently winning bids submitted to co-conspirators' "historical" customers;

       g.     where a co-conspirator could not withdraw its inadvertently winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer; and

       h.     instructing new employees as to how to determine whether and how to bid on or quote a price for the business of liquid aluminum sulfate customers so as to comport with the agreement not to compete between the defendant and co-conspirators.

## TRADE AND COMMERCE

    14.    At all times relevant to this Information, the activities of REICHL, his co-conspirators, and Company 1 with respect to the sale and marketing of liquid aluminum sulfate

5

that are the subject of this Information were within the flow of, and substantially affected, interstate trade and commerce.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

WILLIAM J. BAER
Assistant Attorney General
Antitrust Division
U.S. Department of Justice

JEFFREY D. MARTINO, Chief
STEPHEN J. McCAHEY, Assistant Chief
New York Office
Antitrust Division
U.S. Department of Justice

BRENT SNYDER
Deputy Assistant Attorney General
Antitrust Division
U.S. Department of Justice

PATRICIA L. JANNACO
MARY ANNE F. CARNIVAL
FRANK A. CAVANAGH
Trial Attorneys, New York Office
Antitrust Division
U.S. Department of Justice
26 Federal Plaza, Suite 3630
New York, New York 10278
Tel:   (212) 335-8034
Fax:   (212) 335-8023
Email: patricia.jannaco@usdoj.gov

MARVIN N. PRICE, JR.
Director of Criminal Enforcement
Antitrust Division
U.S. Department of Justice

Dated: September 29, 2015

6

# EXHIBIT C



THE UNITED STATES
DEPARTMENT *of* JUSTICE
*en* ESPAÑOL

HOME    ABOUT    AGENCIES    BUSINESS    RESOURCES    NEWS    CAREERS    CONTACT

Home » Office of Public Affairs » Briefing Room » Justice News

## JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                    Tuesday, October 27, 2015

### Former Executive Admits Guilt in Conspiracy Affecting Water Treatment Chemicals

A former executive of a water treatment chemicals manufacturer has pleaded guilty for his role in a conspiracy to eliminate competition by fixing prices, rigging bids and allocating customers for liquid aluminum sulfate supplied to municipalities and pulp and paper companies in the United States.

Frank A. Reichl, of Flanders, New Jersey, admitted to agreeing not to compete for contracts for liquid aluminum sulfate, a coagulant used by municipalities to treat drinking and waste water, and by pulp and paper companies in their manufacturing processes.

"By agreeing not to disturb each other's 'historical' business, Reichl and his co-conspirators cheated municipalities and paper companies out of competitive prices for their supplies of liquid aluminum sulfate, a key water treatment chemical," said Assistant Attorney General Bill Baer of the Justice Department's Antitrust Division. "We continue to work with our partners at the FBI to hold offenders in this industry criminally accountable."

According to documents filed with the court, from 1997 until July 2010, Reichl and his co-conspirators met to discuss each other's liquid aluminum sulfate business, submitted intentionally losing bids to favor the intended winner of the business, withdrew inadvertently winning bids and discussed prices to be quoted or bid to customers. Reichl is the first defendant to plead guilty to participating in this decade-and-a-half-long conspiracy.

"Reichl and his co-conspirators colluded to circumvent competitive bidding and independent pricing for liquid aluminum sulfate contracts, and conspired to raise prices by submitting artificially inflated bids to their customers," said Special Agent in Charge Richard M. Frankel of the FBI's Newark Division. "They also allocated customers in furtherance of their collusive scheme. By agreeing to violate both the spirit and the letter of the competitive process, Reichl and others defrauded municipalities as well as pulp and paper companies out of millions of dollars."

A violation of the Sherman Act carries a maximum penalty of 10 years in prison and a $1 million fine for individuals. The maximum fine for a Sherman Act charge may be increased to twice the gain derived from the crime or twice the loss suffered by the victims if either amount is greater than the statutory maximum fine.

The investigation into collusion in the liquid aluminum sulfate industry is being conducted by the Antitrust Division's New York Office and the FBI's New Jersey Office. Anyone with information regarding price fixing, bid rigging or customer allocation in the liquid aluminum sulfate industry should contact the Antitrust Division's New York Office at 212-335-8000, call the Antitrust Division's Citizen Complaint Center at 1-888-647-3258 or visit www.justice.gov/atr/contact/newcase.htm.

15-1324                                                            Antitrust Division